# UNITED STATES DISTRICT COURT

FILED
JUL 08 2011
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

**EASTERN** DISTRICT OF **CALIFORNIA**

-oOo-

**UNITED STATES OF AMERICA**
**v.**
**WILFRED LUCE**

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER: 11 mj 0189 DAD

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In San Joaquin County, in the Eastern District of California defendant(s) did,

- **between on or about March 12, 2011, and on or about July 6, 2011, did knowingly receive and distribute visual depictions using a means and facility of interstate and foreign commerce, and that had been transported in and affecting interstate and foreign commerce, and which contained materials which had been so transported, by any means, including by computer, where the production of such visual depictions involved the use of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct as defined in Title 18, United States Code, Section 2256(2); and ,**

- **on or about July 6, 2011, did knowingly possess and knowingly access with intent to view, matter which contained visual depictions that had been transported using a means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce, and which was produced using materials which had been so transported, by any means, including by computer, where the production of such visual depictions involved the use of a minor engaged in sexually explicit conduct and such visual depictions were of such conduct, as defined in Title 18, United States Code, Section 2256(2), all in violation of Title 18, United States Code, Section 2252(a)(4)(B);**

in violation of **Title 18, United States Code, Section(s) 2252(a)(2) and (a)(4)(B)**, respectively. I further state that I am a Special Deputy United States Marshal, assigned to the Sacramento Internet Crimes Against Children Task Froce, and that this complaint is based on the following facts:

- **See Attached Affidavit**

X Continued on the attached sheet and made a part hereof.

[signature]
Signature of Complainant JAMES WILLIAMS
Special Deputy U.S. Marshal
Sacramento ICAC Task Force

Sworn to before me, and subscribed in my presence

July 7, 2011 at Sacramento, California

Date City and State

DALE A. DROZD

United States Magistrate Judge

Name and Title of Judicial Officer

[signature]
Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, James Williams, being duly sworn, depose and state:

1. I am a Detective with the Sacramento County Sheriff's Department (SSD), presently assigned to the Sacramento Internet Crimes Against Children (ICAC) Task Force. I have been assigned to the Sacramento ICAC Task Force since August 2001. I have been employed by the SSD since April 1991. In August 2006, I was cross designated as a Special Deputy United States Marshal. As part of my daily duties as a Detective, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251 and 2252. I have received training in the area of child pornography and child exploitation and as part of my duties have observed and reviewed numerous examples of child pornography and visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I have attended numerous courses in the investigation of child sexual exploitation, child pornography, and online child sexual exploitation. In the course of my duties I have been the investigating officer and Affiant of over 100 applications for search warrants relating to numerous child pornography investigations.

2. I also have provided instruction to both law enforcement and civilians in the area of Internet security, online child exploitation, as well as social networking sites, such as MySpace and Facebook. I have received extensive training in the areas of computers and computer forensics, and I am considered a subject matter expert in high technology crimes and child exploitation. I have certifications from the Robert Presley Institute of Criminal Investigation in the investigation of High Technology Crimes. As a subject matter expert, I have assisted with the development of California Peace Officer Standards and Training (POST) telecourses for these subjects. I have also written and distributed, nationwide, several papers in regards to investigations of Peer to Peer file sharing investigations.

3.  This Affidavit is made in support of an application for an arrest warrant for **Wilfred Luce**, 840 W. Fremont St, Stockton, California (hereinafter "SUBJECT").

4.  I believe that there is probable cause to believe that the SUBJECT has violated 18 U.S.C. § 2252 (a) (4) (B), which makes it a crime to knowingly possess matter containing any visual depiction that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct; 18 U.S.C. §§ 2252 (a) (2), which makes it a crime to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed, or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed, shipped or transported in interstate or foreign commerce, by any means including by computer, where the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct.

5.  I am familiar with the information contained in this Affidavit based upon my experience and training, my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography, and the investigation I have conducted.

6.  Because this Affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have not excluded any significant exculpatory evidence. I have set forth only those facts that I believe are necessary to establish probable cause to believe that the SUBJECT has violated 18 U.S.C. § 2252. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

**Definitions**

1. "Child Pornography" includes the definition found at 18 U.S.C. § 2256(8), and is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

2. As used in this affidavit, "child erotica" means materials or items that are sexually arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions. Such material may include non-sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals.

3. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

4. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

5. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, genital-anal, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

**The Internet and Definitions of Technical Terms Pertaining to Computers**

1. As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers[1] and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet (through a university, an employer, or a commercial service such as an "Internet Service Provider" or "ISP" [see definition of "Internet Service Provider" below]). Once the individual has accessed the Internet, that individual can use Internet mail services, including sending and receiving e-mail. In addition, the individual can visit web sites (see definition of "web sites" below), and make purchases on the web sites.

2. Set forth below are some definitions of technical terms, used throughout this Affidavit, and in Attachments A, B, and C, hereto, pertaining to the Internet and computers more generally.

   a. Client/Server Computing: Computers on the Internet are identified by the type of function they perform. A computer that provides resources for other computers on the Internet is known as a server. Servers are known by the types of service they provide; that is, how they are configured. For example, a web server is a machine that is configured to provide web pages to other computers requesting them.. A client computer is a computer on the Internet

[1] The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."

that is configured to request information from a server configured to perform a particular function. For example, if a computer is configured to browse web pages and has web page browsing software installed, it is considered a web client.

b. Computer system and related peripherals, and computer media: As used in this Affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, and other visual depictions of such Graphic Interchange formats, including but not limited to, JPG, GIF, TIF, AVI, and MPEG.

c. Digital device: includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

d. Domain Name: Domain names are common, easy to remember names associated with an Internet Protocol address (defined below). For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.

e. <u>Hash value</u>: A mathematical algorithm generated against data to produce a numeric value that is representative of that data. A hash value may be run on media to find the precise data from which the value was generated. Hash values cannot be used to find other data.

f. <u>Internet Service Providers (ISPs) and the Storage of ISP Records</u>: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage." See 18 U.S.C. § 2510 (15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long-term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." See 18 U.S.C. § 2711(2).

g.  Internet Protocol Address (IP Address): Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ dynamic IP addressing, that is they allocate any unused IP addresses at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial up session. Once the session ends, the IP address is available for the next dial up customer. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other

words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

h. Uniform Resource Locator (URL): The address of a resource or file located on the Internet, also called a "domain name".

i. Web site Hosting: Web site hosting provides the equipment and services required to host and maintain files for one or more web sites and to provide rapid Internet connections to those web sites. Most hosting is "shared," which means that multiple web sites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a Web site, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a Web site. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co-location facilities offer customers a secure place to physically house their hardware and equipment as opposed to keeping it in their offices or warehouses, where the potential for fire, theft, or vandalism is greater.

**Computers and Child Pornography**

1. Based upon my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved

with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography use membership-based/subscription-based web sites to conduct business, allowing them to remain relatively anonymous.

2. In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which child pornography collectors interact with, and sexually exploit, children. Computers serve four basic functions in connection with child pornography: production, communication and distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

    a. Production: Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b. Communication and Distribution: The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. In addition, the Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[2] to look for "footprints" of the web sites and images accessed by the recipient.

c. Storage: The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 80 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done,

[2] "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.

there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

**Overview of Peer-to-Peer Child Pornography Investigation; Terms, Background and Methodology:**

1. In October 2005 your Affiant and Internet Crimes Against Children Task Force Agents began working an Internet undercover operation to identify persons using peer-to-peer (P2P) software on the Internet to traffic in child pornography. Your Affiant knows from training and experience that peer-to-peer networks, are frequently used to trade child pornography.

2. While examining P2P file sharing networks your Affiant learned that computer users can chose to install publicly available software that facilitates the trading of images. The software, when installed, allows the user to search for pictures, movies and other digital files by entering text as search terms. That text search is sent to an ultra-peer. An ultra-peer is an index server that handles requests and examines submitted file lists from peers that it knows about for files matching the text search request. A file list is then sent back to the requesting user who can choose to download files from peers who possess at least a portion of the file.

3. Search results presented to the user allow the user to select a file and then receive that file from other users around the world. These users can receive the selected file from numerous sources at once. The software can balance the network load and recover from network failures by accepting pieces of the file from different users and then reassembling the file on the local computer.

4. Peer to peer networks can only succeed in reassembling the file from different parts if the parts all come from the same original file. Your Affiant knows that multiple persons sharing one file can deliver different pieces of that file to the local software

and the local software can insure that a complete and exact copy can be made from the parts. Your Affiant has been able to confirm from use of the software that different copies of the same file can be named differently.

5. Peer to peer computer software has different methods to insure that two files are exactly the same. Your Affiant knows from training and experience that the method used by the P2P operation described herein involves a compressed digital representation method called Secure Hash Algorithm Version 1 or SHA1. Your Affiant knows that the Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS). The United States of America has adopted the SHA1 hash algorithm described herein as a Federal Information Processing Standard.

6. Digital files can be processed by this SHA1 standard resulting in a digital signature. By comparing these signatures your Affiant can conclude that two files are or are not identical with a precision that greatly exceeds 99.9999 percent certainty. Your Affiant knows through the computer forensic community that there has never been a documented occurrence of two different files being found on the Internet having different contents while sharing the same SHA1 value.

7. The use of SHA1 compressed digital representations for the matching of movies and images has proven to be extremely reliable. Through this method of comparison your Affiant has matched thousands of files and has never found two files with different contents but the same SHA1 value.

8. The P2P network investigated in this operation uses the SHA1 digital signature to verify the unique identity of individual files. Your Affiant knows that users attempting to trade files on a P2P file-sharing network can place files from their local computer into a shared file directory. If that user then starts the P2P software, that local computer calculates the SHA1 signature for each shared file and provides that information to other users wishing to trade files.

9. Entering search terms in the P2P software results in a list of SHA1 digital signatures that your Affiant can choose for download. By using this type of search your Affiant compares the offered SHA1 signatures with SHA1 signatures known to belong to movies or images of child pornography. Your Affiant confirms these SHA1 values as belonging to child pornography by examining the files from previous investigations with the matching SHA1 value. By watching these movies or viewing these images your Affiant is able to determine the exact file referenced by the given SHA1 value. Once a matching set of digital signatures is identified, your Affiant submits a download request for the file.

10. This method has proven to be extremely reliable, working just like software used by end users around the world in locating and downloading precise files. Once the download of child pornography is initiated, your Affiant receives a list of download candidates who are participating in the possession, receipt and/or distribution of child pornography. This feature allows your Affiant to conduct undercover operations that involve images of child sexual abuse being traded on peer-to-peer networks.

11. Internet computers identify each other by an Internet Protocol or IP address. Your Affiant knows that these IP addresses can assist law enforcement in finding a particular computer on the Internet. These IP addresses lead the law enforcement officer to a particular Internet Service Provider (ISP) or company. Given the date and time the IP address was used, an ISP can typically identify the account holder by name and physical address.

12. Your Affiant learned that searching on a peer-to-peer network as described above results in your Affiant receiving a list of IP addresses identifying locations where a computer has P2P software installed and individual files have been reported as available for download with a specific digital signature (SHA1). These computers are referred to as download candidates. A download candidate is a computer that was reported by an ultra-peer as a source for the file listed by SHA1 value. In almost every known case, the download candidate serves those files to P2P users across the

Internet. Computers from throughout the world can download files from download candidates without regard to geographic location. Files located on P2P download candidates are quickly available throughout the world due to the distributed sharing model of P2P networks.

13. Peer to peer software may display the Globally Unique Identifier (GUID) identification number of computers offering to share files on the network. A Globally Unique Identifier or GUID is a pseudo-random number used in software applications. This GUID number is produced when some P2P software applications are installed on a computer. While each generated GUID is not guaranteed to be unique, the total number of unique keys is so large that the probability of the same number being generated twice is very small. When comparing these GUIDs, your Affiant can quickly determine with a high degree of certainty that two different IP addresses that are associated with the same GUID are associated with the same computer. Should the computer be used to access the internet from a different IP address the GUID will remain the same as it is intrinsic to the computer system. Further, should the user of the computer update the file sharing program with a newer version, a new GUID will be assigned to the computer for the updated program.

14. Cooperating police agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. With this pooled information police get a better understanding of the global information available about a suspect who resides in their area of jurisdiction. This information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet. Investigators from around the world gather and log information, which can be used by an investigator to build probable cause on one specific case.

15. By examining a list of IP addresses your Affiant can locate computers that are reported to be in California. By comparison of the SHA1 digital signatures your Affiant can conclude that a computer, originating from an IP address known to be in California, has P2P software installed on it and contains images of child pornography. With this information a request can be made to the Internet service provider to

identify the specific physical address related to the use of P2P software in the exchange of child pornography.

16. Your Affiant is aware that over 300 search warrants have been executed in the State of California by using the above method of investigation. This method has proven to be extremely reliable in determining the location of computers that were involved in the P2P-facilitated trading of child pornography. Your Affiant has been involved in many of those search warrants either as the primary investigator, or assisting other investigators with their warrants. By using the above listed method of investigation, nearly every case was verified through the following means:

    a.  Evidence of child pornography was found on the computer;

    b.  If no images of child pornography were found on the computer, interviews of persons using those computers verified that child pornography had been present at one time but had been deleted or the computer with the child pornography had been removed from the premises; or

    c.  Evidence was found showing that images of child pornography were moved from the computer and stored on other media.

17. Your Affiant knows that Detective William Wiltse with the Salem Oregon Police Department has created an automated system called Peer Spectre, that reads in a consistent and reliable manner the publicly available advertisements from computers that are identifying child sexual abuse images available for distribution. The software reads these reported offers to participate in the sharing of child pornography and reports the time, date, SHA1 values and filename for each individual computer in the same way every time. Your Affiant has validated this software by running identical search terms through the manual method described above and the automated system using Peer Spectre, and has confirmed that Peer Spectre performs in the same way with matching results as the previous manual investigative techniques used in this operation to date.

18. An investigator can review these details and identify a pattern of activity that links a single IP address to specific files of child pornography with an extremely high degree of accuracy. Peer Spectre automates the search process but conducts and reports the search in the same manner that was previously done by individual investigators. Peer Spectre does not report details that are not also discoverable by the general public using Internet available software.

19. Your Affiant uses an undercover investigative software, called E-Phex, which is currently used in state and local Peer-to-Peer (P2P) file sharing investigations to download the files of child pornography. Downloading is a transfer of data from one computer to another. Since your Affiant was doing the download, your Affiant was receiving data which was transmitted from another computer. This software is designed by and for law enforcement and only available to law enforcement officers who have attended the appropriate training. Your Affiant has done so. E-Phex is designed to connect directly to one IP address and browse or download from one specific peer at a time. E-Phex is a P2P file sharing client similar to other file sharing clients (like Limewire or Bearshare) on the Gnutella network which are free and available to the public.

20. Using source code from a free P2P client, E-Phex was modified by/for law enforcement to meet the stringent investigative requirements of these cases. For example, E-Phex will only download files from a single source – the target IP, while the public version will download from many sources. E-Phex thus takes much longer to download files because of the single source limitation. E-Phex uses only publicly available P2P options which follow the programming language (protocols) set forth in the public P2P protocol standards. No functionality outside of the publicly available protocols is added, thus eliminating any potential private intrusion on the suspect IP's computer or files. E-Phex uses the same code and language that is available to any and all software developers.

21. A listing of IP address, which have been observed on P2P networks offering files that have a SHA1 Hash Value of suspected files of child pornography (hereinafter "suspect IP"), are included in E-Phex. These IP addresses are obtained by the investigator from law enforcement secured databases. One of the sources of these IP addresses is from IP addresses that are observed by automated systems, such as Peer Spectre. An automated function of E-Phex will attempt to connect to a suspect IP address when it is observed being "on-line" and send a request to browse (i.e. look at and log the information being transmitted and/or shown by the suspect IP) and/or download a file from the shared folder of the computer utilizing the suspect IP address. If the connection is not made to either browse or download, E-Phex will continue automatically to attempt to make a connection with the suspect IP address.

22. If a connection is made with the suspect IP address, E-Phex will log the connection. It will also take a photo snapshot of the browse in real time so as document exactly what was being displaying by the computer of the suspect IP address. E-Phex then attempts to download files from the suspect IP address directly into the investigator's computer and, if successful, segregates it from other evidence.

23. Prior to beginning an investigation using E-Phex, your Affiant, by installing E-Phex on a law enforcement secured and ICAC-only computer, created a folder structure on the hard drive of your Affiant's own computer in which E-Phex stores files and logs that are downloaded and created, respectively. Both the downloaded files and logs are reported in the appropriate folders created for the target peer IP.

24. E-Phex separates completed downloaded files from incomplete downloaded files. E-Phex logs the Netstats. Netstats (or network statistics) is a command-line tool that displays network connections (both incoming and outgoing), routing tables, and a number of network interface statistics. This enables your Affiant to ascertain exactly which IP address the download came from and at precisely what time. E-Phex captures the file names and SHA-1 values of the images appearing on the P2P client associated with the suspect IP address that match known SHA-1 values of child pornography. E-Phex also captures the P2P version being used by the suspect IP

address.

25. Upon E-Phex downloading the file, another screen shot of the download is logged that captures file information, including the file name, hash value, status of the download, time of the download, and size of the file. The logs themselves identify that a known SHA1 value of child pornography has been located, and when the download transfer started and ended. The length of time the download process takes depends on the size of the file and speed of the internet/computer of both your Affiant and the suspect IP's computer. When a file has successfully completed the download process, E-Phex notifies your Affiant.

26. I have validated E-Phex by conducting investigations manually using publicly available Gnutella clients and compared the results with the automated E-Phex process and found the results to be identical.

**Probable Cause to Arrest the SUBJECT:**

The San Jose ICAC Investigation

1. On March 30, 2011, Detective R. Chubon, San Jose Police Department, ICAC Task Force, was conducting an investigation looking for computers that were sharing files of child pornography within the San Jose region.

2. Detective Chubon located an IP address of **67.181.70.231** and downloaded a file from a computer at that IP address.

3. The file was titled "(Pthc) (Ptsc) 11yo Opens Vagina Sister assists Stickam.avi". The SHA1 value for this file was YO2CXEX6D7KJY3LRLKXHRRL2ERSRZDJS. Detective Chubon described his file as follows:

    a. Approx. 11 min 57 sec digital video shows 2 girls who appear to be sitting in front of a computer while communicating online with someone using a webcam. One of the girls appears to be 8 to 12 years old, pulls down her

underwear, and then masturbates herself digitally and with the handle of a
hairbrush. During the video the girl also exposes her breasts and her genitalia
are touched by the second girl.

4. Detective Chubon began the download of this file from the IP address of
**67.181.70.231** on March 30, 2011, at 21:56:08 UTC (-0700) and the download was
completed on March 31, 2011 at 00:06:23 UTC (-0700). The IP address was
determined to belong to Comcast
Cable.

5. On April 21, 2011, Detective Chubon obtained a search warrant, signed by the
Honorable Judge Edward Lee, Santa Clara Superior Court for the subscriber
information for the IP address of **67.181.70.231** from March 30, 2011, at 21:56:08
UTC (-0700) to March 31, 2011, at 00:06:23 UTC (-0700).

6. Comcast provided the subscriber information to Detective Chubon as follows:

Service Address:

Tony Zuniga
840 W Fremont Street
Stockton, CA 95203-2704
209-xxx-8044

Billing Address:

PO Box 7448
Stockton, CA 95267-0448
Account Connected 2-27-2007
Email: STOCKTONSS@comcast.net

Comcast also provided the IP lease information showing that the IP address of
**67.181.70.231** was assigned to this subscriber from **November 11, 2010, at 20:31:52
UTC to April 7, 2011, at 22:34:14 UTC.**

The Stockton Police Department Investigation

7. Once Detective Chubon determined that the IP address was in Stockton, CA, he forwarded his investigation to Detective H. Heim, Stockton Police Department on April 22, 2011.

8. On May 18, 2011, Officer M. Otten, Stockton Police Department, obtained a search warrant from the Honorable Judge R. Vlavianos, San Joaquin Superior Court for the IP address **67.181.70.231 from March 30, 2011, at 21:56:08 UTC (-0700) until the time the warrant was received.**

9. On May 23, 2001, Comcast provided the following information to Officer Otten:

Service Address:

Tony Zuniga
840 W Fremont Street
Stockton, CA 95203-2704
209-xxx-8044

Billing Address:

PO Box 7448
Stockton, CA 95267-0448
Account Connected 2-27-2007
Email: STOCKTONSS@comcast.net

Comcast also provided the IP lease information showing that the IP address of **67.181.70.231** was assigned to this subscriber from **March 30, 2011, at 21:56:08 (-070 UTC) to May 19, 2011, at 18:34:49 UTC.**

The Sacramento ICAC Investigation

10. Detective S. Smith, Sacramento Sheriff, Detective D. Konecny, San Joaquin Sheriff and Special Agent M. Sparks, California Department of Justice and I are all assigned to the Sacramento Valley ICAC Task Force. The four investigators all conduct undercover investigations looking for computers offering files of Child Pornography in the Eastern District of California.

13. Some Gnutella clients allow the user to enter a nickname for use in peer-to-peer chat features the client may have. The nickname is transmitted during a direct connection. The nickname obtained from the remote client was "Red."

14. On Saturday, March 12, 2011 while directly connected to the computer at IP address **67.181.70.231**, E-Phex captured the GUID associated to the Gnutella client operating on that computer. The Gnutella Client reported itself as Shareaza 2.5.4.0. The GUID was reported as follows: 61A7A33EA91E5244BF332B8B56C263F8.

15. On Saturday, March 12, 2011 E-Phex conducted a DNS check on the IP address **67.181.70.231** through the American Registry for Internet Numbers (ARIN). E-Phex received information that the IP address **67.181.70.231** is registered to Comcast Cable Communications, Inc.

16. On Saturday, March 12, 2011 at 2023 hours (PST), using the E-Phex software, a direct connection was again established with a computer at IP address 67.181.70.231 and a file list was obtained from the shared folder. The file list showed changes in the number and/or content of files matching suspected child pornography hash values contained in the Peer to Peer since the last time E-Phex successfully browsed the shared folder of the computer at IP address 67.181.70.231. The file list contained 334 files of which 179 files match suspected child pornography hash values contained in the Peer to Peer hash database. Below is a sampling of 10 filenames and their Sha1 values.

| | |
|---|---|
| pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (202)(1).jpg | ZM7AC4T32E5SN7CHVKINABTYITEFRTJF |
| Pre-Rape (Doithard Girl) 6Yo Nq Kleuterkutje Ptsc Kingpass.mpg | MHRSLRXGB3VH6VS4F3MKB4CCN4GQHXHD |
| aaaa boylove gay pedo preteen boy sex child porn 119.jpg | QUK5BT6W6RCXPKA2Y7WWIXPFTEN3IIIG |
| pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo | R64DBG4CJC64VYFDID223XRDMMPEELZV |

| 6yo 9yo tara babyj (121).jpg | |
|---|---|
| Pthc 2010 5Yo Kathie Fucked Pencil And Daddy Masturbating 5m53S (((Very Good))) Wmv Kait Part1Notcomplete.avi | N25RDGIN4UKQNH2QBZN4BMEXKRYS5XIE |
| #Melody cute preteen slut 003.JPG | F67UWOPZQN3KLXKHSYH5LZIWLW7S7M3K |
| (pthc pedo) 2011.avi | YDEVZYJQQBSHUCXOODST3KTHKHR6C5US |
| 124084388835.jpg | OKG2XK5UPS4PQBFLIX72OO5SYLDYOMS4 |
| PTHC -G- Macy 5yo GETS THE WORKS 2m40s.avi | 4FIVXHUNZ227FAGZRZRZ7VLMVZUPRA5G |
| Hussyfan) (pthc) (r@ygold) (babyshivid) ultpriv.mpg | 2M3EMFOKK34ZE66SQAHE4CXDC2SBZKPQ |

17. On Saturday, March 12, 2011 at 2150 hours (PST), using the E-Phex software, a direct connection was again established with a computer at IP address **67.181.70.231** and a file list was obtained from the shared folder. The file list showed changes in the number and/or content of files matching suspected child pornography hash values contained in the Peer to Peer since the last time E-Phex successfully browsed the shared folder of the computer at IP address **67.181.70.231**. The file list contained 399 files of which 215 files match suspected child pornography hash values contained in the Peer to Peer hash database. Below is a sampling of 10 filenames and their Sha1 values.

| pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (202)(1).jpg | ZM7AC4T32E5SN7CHVKINABTYITEFRTJF |
|---|---|
| Pre-Rape (Doithard Girl) 6Yo Nq Kleuterkutje Ptsc Kingpass.mpg | MHRSLRXGB3VH6VS4F3MKB4CCN4GQHXHD |
| aaaa boylove gay pedo preteen boy sex child porn 119.jpg | QUK5BT6W6RCXPKA2Y7WWIXPFTEN3IIIG |
| pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (121).jpg | R64DBG4CJC64VYFDID223XRDMMPEELZV |
| Pthc 2010 5Yo Kathie Fucked Pencil And Daddy Masturbating 5m53S (((Very Good))) Wmv Kait | N25RDGIN4UKQNH2QBZN4BMEXKRYS5XIE |

| | |
|---|---|
| Part1Notcomplete.avi | |
| [redacted] | F67UWOPZQN3KLXKHSYH5LZIWLW7S7M3K |
| (pthc pedo) 2011.avi | YDEVZYJQQBSHUCXOODST3KTHKHR6C5US |
| 124084388835.jpg | OKG2XK5UPS4PQBFLIX72OO5SYLDYOMS4 |
| [redacted] | 4FIVXHUNZ227FAGZRZRZ7VLMVZUPRA5G |
| Hussyfan) (pthc) (r@ygold) (babyshivid) ultpriv.mpg | 2M3EMFOKK34ZE66SQAHE4CXDC2SBZKPQ |

18. In total, there were eight connections by investigators to the IP address **67.181.70.231** between March 13, 2011 and April 10, 2011, during which files of suspected child pornography were seen being offered for distribution by a computer at that IP address.

19. On Sunday, April 10, 2011, between 0010 hours (PDT) and 0042 hours (PDT), Special Agent M. Sparks, using the program E-Phex successfully automated the Gnutella client Phex to download the following 1 file that the computer at IP address **67.181.70.231** was making available:

| | |
|---|---|
| [redacted] | K4WZT7DZ4LIV5MJHVXUTYH2V3YWDKIHU |
| Description: [redacted] | |

20. The computer at IP Address **67.181.70.231** was the sole candidate for this download, and as such, the entire file was downloaded directly from this IP Address

21. Based upon the information obtained from Comcast by Detective R. Chubon (San Jose PD) and Officer M. Otten (Stockton PD), the IP address **67.181.70.231** was

assigned to the location **840 W. Fremont Street, Stockton, CA** during all of these connections.

22. On June 23, 2011, I met with Detective H. Heim, Officer M. Otten and other detectives from the Stockton Police Department to discuss this investigation. Officer M. Otten provided me with all of their reports. We drove by the location of 840 W. Fremont Street, and obtained photographs and a description of the location. The location is a large open air storage facility called "Stockton Secured Storage". This name is consistent with the email address associated with the Comcast Cable account of StocktonSS@comcast.net. The facility is fenced with a chain link fence. There is a cement building at the north portion of the property. There is a gate attached to this building, which allows access to the paved portion of the storage area. This building has the numbers "840" in white with a black background posted on the north side of the building. There is a mailbox located below these numbers as well as a U-Haul key drop box. There are signs that say "Stockton Secure Storage" both on the building as well as on a large "garage style" structure just to the east of the gate. Just inside the chain link fence gate is another door, facing east, which appears to be the office area for the storage yard. South of that office area is a large covered structure which would allow for covered storage. (See attachment D for photographs)

23. At the west edge of the building, still facing north is another door that says "M.T.Z. Security Patrol." M.T.Z. Security Patrol is listed as having the same address, 840 W. Fremont St., according to internet searches. Just to the west of the door for M.T.Z. Security is a fenced but open area and then another building that runs parallel (north south) with Stockton Street. This building is blocked from the view of the street by a residence whose address is listed as 848 W. Fremont St.

24. Going south on Stockton Street, there is a wooden fence between the residence listed as 848 W. Fremont Street and the larger concrete and wood structure that appears to connect with the roofline of the structure in the storage yard area. There is a pedestrian door with a black security door that faces west here. The color scheme for this building is the same as that of the front of **840 W. Fremont Street.**

25. Detective Heim checked the city property database and determined that according to the city records the property was all part of the parcel belonging to "848 W Fremont Street". 848 W Fremont was a residence located on the north west corner of the property line and sat outside the fence line for the Stockton Secured Storage. I reviewed a Stockton Police Department report (11-16622) where on June 11, 2011, at 2345 Hours, Officers Krein and Reeder contacted the occupant of 848 W Fremont St. Both officers were in full uniform and were driving a marked police vehicle. They knocked on the door of 848 W. Fremont St and identified the female who answered the door as Mrs. Zuniga. Officer Reeder told Mrs. Zuniga that they were checking on a 9-1-1 call and making sure everything was okay. They then asked if anybody was living in the trailers or buildings on the property. Mrs. Zuniga said "Will" lives in the building right behind hers (pointing south). Mrs. Zuniga told Officer Reeder that "Will's" door faces west and is accessible from Stockton Street. The officers knocked on that door but did not receive an answer.

26. Detective Heim determined that an Anthony Zuniga, date of birth of June 20, 1960, had been reported as missing person on August 7, 2010, and was found deceased on August 16, 2010. Anthony Zuniga had listed his address as 840 W. Fremont Street. Tony Marciano Zuniga, date of birth August 29, 1940, was listed in a Stockton Police Report (08-39638) as the business owner of 840 W. Fremont St. Tony M. Zuniga's DMV record showed that his address was PO Box 7448, Stockton, CA. This was the same mailing address as the Comcast account identified above.

27. A separate Stockton Police report from May 19, 2010 (10-20924) showed that Wilfred Luce, date of birth January 30, 1963, had reported that he was the manager of the Stockton Secured Storage facility at 840 W. Fremont Street.

28. Wilfred Luce was the suspect in a 2008 child pornography investigation. During that investigation a search warrant was obtained and numerous child pornography images were located during the search. This investigation was referred to the Sacramento Federal Bureau of Investigation for follow up. It was discovered that the case was

declined by AUSA L. White and referred back to San Joaquin County District
Attorney's Office. Luce was also a suspect in a sodomy case in 2005 (Stockton PD
05-25830). This investigation was declined by the San Joaquin County District
Attorney's Office.

29. A check of California Department of Motor Vehicles showed that Wilfred Frank Luce
Jr had listed his mailing address as 840 W. Fremont St., Apt C, Stockton, CA 95203
with an additional address of 840 W. Fremont St, Stockton, CA. Luce also had a 1994
Dodge registered to him at the same address (**840 W. Fremont St**). The license plate
of this vehicle was 3EYV696.

30. I reviewed the Stockton Police Department Report (08-38777) for the investigation of
the child pornography that was found where Luce was the suspect. According to the
case file, the case originated when Luce's wife, Sherilyn Luce, had found files of
child pornography on a computer that her husband had been using. During this
investigation, officers saw files of child pornography in a folder called "Hope." A
search warrant was later served on Sherilyn and Wilfred Luce's residence at the time
(415 E. Cleveland) and during that search warrant service CD and DVD's were
seized. These were later reviewed and found to contain files of child pornography.
The CD / DVD's were labeled as if they were computer programs, such as "Windows
Dr Plus". The files of child pornography were found to be contained in folders within
folders as if in an effort to conceal the files. Numerous files of child pornography
were found on these CD and DVDs.

31. Further in this report (08-38777), Detective B. Fry, Stockton Police, went to his place
of business, which was MTZ Security, **840 W. Fremont St.** Detective Fry saw Luce
standing at the counter inside the business and asked to speak with him out of earshot
of the others. Detective Fry told Luce that he had a search warrant for his van and
subsequently searched it, there at the location. Detective Fry told Luce that he was
looking for Luce's laptop. Luce told him that it was in his room, which was located in
the shop. Detective Fry asked Luce if he could take his laptop and Luce consented.
Luce then walked Detective Fry under an overhang almost like a garage and then to

an outbuilding that is located on the west side of the property, which was where Luce had his laptop. This description of the location of Luce's computer is consistent with what I observed at **840 W. Fremont St.**, and is, I believe, the building that is located along the west side of the property with the door exiting onto Stockton St.

32. Detective Heim told me that law enforcement had driven by the location previously and have seen Wilfred Luce, whom they recognized from the previous investigation, standing out front of the business smoking.

33. A check of the public records databases also showed that Wilfred Luce had listed his address as **840 W. Fremont St, Stockton, CA** as of August 2008.

34. I contacted Postal Inspector Mike Chavez and inquired about who had access to the PO Box 7448 as well as who received mail at the **840 W. Fremont St** address. Postal Inspector M. Chavez told me that the postal carrier said that **840 W. Fremont St** was a storage business and that Wilfred Luce received mail there. The carrier also said that it was a single unit and that there were not apartments or suites at that location. In regards to the Post Office box (PO Box 7448) the application showed the following information:

Stockton Secured Storage / DBA / MTZ Security Patrol
Tony Marciaco Zuniga (Pres)
840 Fremont St, Stockton, CA 95621
Others on box - Oscar Cantu and Will Luce

35. While we were obtaining a description and photographs of the residence, I also checked the area for wireless access points. There were three wireless access points that appeared to be close to the **840 W. Fremont St.** address. The first was named "Linksys" and was unsecured. The next was named "Netgear" and was unsecured. The last was named "TGs Wireless" and was secured using WPA.

36. I reviewed the times that a computer had been observed offering files of suspected Child Pornography from the IP address of 67.181.70.231 and saw that the majority of

the activity was during time periods that the Stockton Secured Storage was not open. Most of the activity was in the evening and late night hours. The business's posted hours were Monday through Friday from 8 a.m. to 5 p.m., and Saturday and Sunday from noon to 5 p.m.

The July 6, 2011 Search and Interview

37. On July 1, 2011, I obtained a Federal Search Warrant from the Honorable Magistrate Judge E. Brennan for the office, residential and common areas of 840 W. Fremont St, Stockton, CA.

38. On July 6, 2011, myself and other officers served the warrant at approximately 8:00 pm. I contacted Wilfred Luce at the door to his residence (west side of the property). Luce was the only person living in that residence. A computer (Item JH-3) was found running and connected to a monitor in the bedroom of Luce's residence. Shareaza was found to be running on this computer and actively downloading files with names descriptive of files of child pornography. The Shareaza download folder was also open (minimized) and was found to contain numerous files of child pornography. Detective Gaspard (Stockton PD) told me that the download folder contained approximately 16 GB of data.

39. I spoke to Wilfred Luce. After reading him his Miranda rights, he agreed to speak with me. Luce told me that he lived in the residence alone, that the computer belonged to him, and that no one else used it. Luce admitted to using Shareaza to search for and download files of child pornography. Luce stated that he was downloading the files of child pornography and then moving them to an external hard drive. Luce told me that intended to send the external hard drive with the downloaded files on it to his estranged wife and then go to San Francisco and kill himself. Luce was sending the files to his wife because, according to Luce, she had 'set him up' and called the police a few years back in regards to what she thought was child pornography. Luce told me that the external hard drive to which he was saving files was on the top shelf of his closet. This drive was located in the closet (Item JH-12).

40. Luce said that he had been downloading files of child pornography, using file sharing software, since approximately December 2009. Luce said that he had seen files with children as young as infants but that he would delete the infant files. Luce also stated that he was not aware that he was sharing files and thought that he was only downloading.

41. Luce also stated that he was connected to the internet using an ethernet cable (hardwired) which was connected to the router that was used for the business (Stockton Secure Storage).

42. Detective G. Vasilou conducted a forensic preview on the hard drive located in Luce's computer and provided me with a preliminary report. This report included images that were in Luce's Shareaza downloads folder. The following are a sampling of the files that were contained in the folder:

1 C\Documents and Settings\Hippy\My Documents\Shareaza Downloads\Pedo - 8Yo Girl Suck 8Yo Boy Dick pthc 1yo 2yo 3yo 4yo 5yo 6yo 7yo 8yo 9yo 10yo 11yo 12yo hussyfan qqaazz lsm lsb (6).jpg. This file is a color image of a prepubescent child whose mouth is on the penis of a prepubescent boy. The file creation date for this file was June 24, 2011, at 10:42:30 PM.

b. C\Documents and Settings\Hippy\My Documents\Shareaza Downloads\qqaazz pthc pedo dad puts 5 inches into toddler boy ass 01.jpg. This file shows a color picture of a naked prepubescent boy who is laying on his back with his legs up in the air. The prepubescent boy appears to be no older than 8 years of age. There is an adult male's erect penis that appears to be penetrating the prepubescent boy's anus in the image. The file creation date for this file was June 26, 2011, at 10:07:30 AM.

c. C\Documents and Settings\Hippy\My Documents\Shareaza Downloads\Imgsrc Ru pthc Pedo Babyshivid Childlover Private Daughter

Torpedo Ranchi Lolita - pt action_076.jpg. This file is a color image of a naked prepubescent girl with her hand around an adult male's erect penis. The file creation date for this file was July 2, 2011, at 9:03:24 PM.

**Conclusion**

1. Based upon the above information, there is probable cause to believe that the SUBJECT has violated 18 U.S.C. Sections 2252 (a)(2) and (a)(4)(B), which, among other things, make it a federal crime for any person to knowingly possess, and receive and distribute visual depictions of minors engaged in sexually explicit conduct.

2. Based upon the foregoing, this Affiant respectfully requests that this Court issue an arrest warrant for the SUBJECT.

JAMES WILLIAMS
Special Deputy United States Marshal
Sacramento ICAC Task Force

Approved as to form.

KYLE REARDON
Assistant United States Attorney

Subscribed and sworn to before me this
7th day of July 2011

DALE A. DROZD
United States Magistrate Judge
Eastern District of California
Sacramento, California